**G. Thomas CATHERINES, Allan J. Hammer and Haskew Brantley, Plaintiffs,**

v.

**COPYTELE, INC., Bradford Trust Company, Denis Krusos and Frank DiSanto, Defendants.**

**No. 84 CV 4746.**

United States District Court, E.D. New York.

Jan. 9, 1985.

As Amended Feb. 14, 1985.

Reavis & McGrath by John A. Lowe, Glen Banks, New York City, for plaintiffs.

Satterlee & Stevens by James F. Rittinger, New York City, for defendants CopyTele, Krusos and DiSanto.

Bradford Trust Co. by Louis J. Maione, Christopher J. Collins, Associate Counsel, Litigation, New York City, for defendants.

## MEMORANDUM AND ORDER

PLATT, District Judge.

By order to show cause with affidavits annexed three separate individual plaintiffs, each presenting somewhat different circumstances, seek mandatory preliminary injunctions against the defendants enjoining them from taking any actions that would in any way interfere with

(i) plaintiffs' selling the shares of CopyTele, Inc. ("CopyTele") stock that they own; and

(ii) the transfer of the registered ownership of any of the shares of CopyTele stock owned by plaintiffs to a third party or, alternatively,

(iii) setting the closing price of CopyTele common stock on the NASDAQ National Market on December 5, 1984, as the price at which plaintiffs would have sold their stock had defendants not prevented them from doing so in order that plaintiffs' damages may be calculated with certainty.

## FACTS

CopyTele is a Delaware corporation with its principal place of business in Huntington Station, New York.

Denis A. Krusos ("Krusos") is a director and the Chairman of the Board and Chief Executive Officer of CopyTele.

Frank DiSanto ("DiSanto") is a director and the President of CopyTele.

Krusos and DiSanto each own 535,000 shares and members of their families each own respectively an additional 200,000 shares of CopyTele common stock and together Krusos and DiSanto own 38.22 percent of the outstanding shares of that stock and, as the Court understands it, together with their family members they own the majority of the outstanding shares of the stock. As of November 30, 1984, the market value of the stock held by Messrs. Krusos and DiSanto was in excess of thirty-three million dollars ($33,000,000).

Bradford Trust Company ("Bradford Trust") is the transfer agent for CopyTele stock.

From November 9 to November 30, 1982, CopyTele sold an aggregate of 390,000 shares of its common stock to individuals who were officers, employees and others at a price of ten cents a share, or $39,000 in the aggregate.

Plaintiff G. Thomas Catherines purchased 10,000 of these 390,000 shares.

Plaintiff Allan J. Hammer purchased 5,000 of these 390,000 shares.

Plaintiff Haskew Brantley, a State Senator from Georgia, purchased 10,000 of these 390,000 shares.

The stock certificates issued to Messrs. Catherines and Hammer and Senator Brantley did not contain any restrictive legend, and in fact, the words "fully paid and non-assessable" appear on the face of the stock.

The stock sold to plaintiffs was also unregistered. Absent any other restrictions it could be sold over a period of time after two years from the issuance thereof upon compliance with the provisions of Rule 144 under the Securities Act of 1933, as amended.

In October 1984, plaintiffs took action that would allow them to sell their CopyTele stock pursuant to Rule 144 when the holding period expired on November 30, 1984.

On November 30th, Senator Brantley submitted his stock to Bradford Trust for transfer. On December 5th Messrs. Catherines and Hammer submitted their stock to Bradford Trust to transfer. Bradford Trust refused to transfer any of the stock.

Theretofore, by letter dated November 12, 1984, addressed to Bradford Trust Company, Mr. Krusos had advised Bradford Trust that CopyTele takes:

The position that [Messrs. Catherines and Hammer] are not entitled to such shares inasmuch as they did not honor their employment commitments with the Company either by never becoming employed by the Company or by not remaining employed by the Company for any significant period of time. This commitment was a condition of their being issued the shares. We further take the position that all of the employees (including the above persons), and the officers and Directors of CopyTele, Inc., had agreed not to sell shares at this time.

Therefore, the Company's counsel will not issue any opinion under 144, and Bradford Trust Company should not permit transfer of these shares without either our consent or a final order of a Court of competent jurisdiction directing such transfers.

In a similar letter dated December 4, 1984, CopyTele advised Bradford that the shares of Senator Brantley "are restricted and should not be transferred" and "[a]s [heretofore indicated] all such transfers of restricted shares required the prior consent of CopyTele, Inc." (Ex. CC).

In his affidavit sworn to December 17, 1984, submitted in opposition to plaintiffs' motion and at the evidentiary hearing thereon, Mr. Krusos testified that all of the shares in question were sold to the three

plaintiffs on November 30, 1982 at ten cents a share on the oral condition and understanding that the same might not be sold or otherwise transferred until Copy-Tele's "product" was "successfully developed and marketed" or when Mr. DiSanto or Mr. Krusos gave prior written consent to any such transfer.

At the hearing Mr. Krusos testified (and claimed that the plaintiffs knew) that "successfully marketed" meant that a binding order from Xerox for 5,000 units of its product at an "acceptable price" had been received by CopyTele.

CopyTele maintains that these were conditions to which all of its employees and non-employees who purchased shares at ten cents per share agreed in November 1982.

CopyTele employees John Shonnard, Anne Rotondo, Christopher Laspina, Joseph A. Isoldi, Edward G. Lewit, Robert A. Seigler, Henry P. Herms and Jerry Georges, and CopyTele consultants Hershel Smith, Jeff Lebowitz, George Georges and Nettie Lebowitz, the wife of Alvin Lebowitz, a CopyTele consultant, all filed virtually identical affidavits in opposition to plaintiffs' motion stating in pertinent part:

> At the time the shares were offered to me, I agreed that in consideration of the offer of stock at ten cents a share, that until such time as CopyTele developed and successfully marketed its product, I would become and remain a CopyTele employee and would not sell such shares.

All three plaintiffs testified that they made no such agreement with, and were not told of any such condition or restriction by, Mr. Krusos or any other officer or employee of CopyTele before or at the time of their purchase of their shares and were not made aware of the same until, in each case, months after such purchase. None of their shares (and indeed apparently none of the ten-cent shares) were marked subject to any agreement or condition of any kind, no

such agreement or condition was set forth in any contemporaneous writing signed by any of the plaintiffs or by any other ten-cent purchaser, and no such agreement or condition is set forth in any minutes of any meeting of the Board of Directors of Copy-Tele.

Moreover, and most significantly, Copy-Tele in October 1983 made a public offering of 600,000 of its shares and, in its prospectus dated October 6, 1983, filed and used in connection therewith, it is stated in describing the "potential effect on market value of shares" [being offered] as follows:

> The large number of shares of Common Stock of the Company held by its officers, directors and employees of the Company and private investors could be sold by the holders thereof over a period of time after two years from issuance thereof upon compliance with the provisions of Rule 144 and the Securities Act of 1933, as amended.

> Such action, if it takes place, could have a depressing effect on the market value of the Company's Common Stock. *Sale with respect to 1,470,000 shares* [1] *could commence November 8, 1984, with respect to 390,000 shares* [2] *could commence November 30, 1984* and with respect to 250,000 shares could commence on February 28, 1988, subject to the sales volume limitation of Rule 144.

(Emphasis supplied.)

Mr. Krusos testified at the hearing that he and the President of CopyTele, Frank J. DiSanto, were "controlling shareholders" who owned directly and indirectly 735,000 shares apiece which they purchased at one cent per share and were subject to the same agreement and conditions as the plaintiffs but the prospectus made it clear that they were free to commence selling their shares on November 8, 1984 "subject [only] to the sales volume limitation of Rule 144."

---

**1.** Shares owned by Messrs. Krusos and DiSanto and members of their families purchased at one cent per share on November 8, 1982.

**2.** Shares owned by former employees and others (including the plaintiffs) purchased at ten cents per share on November 30, 1982.

In addition, CopyTele theretofore had advised Bradford Trust in writing on June 23, 1983, that Messrs. Krusos' and DiSanto's one-cent shares and the ten-cent shares (including the plaintiffs') "represent 2,110,000 of restricted stock which has to be held for two years from the date of issue before they can be traded."

Plaintiff Hammer testified at the hearing that he was employed by Visual Sciences, Incorporated ("Visual"), another company of which Krusos was Chairman, in the accounting department from 1977 until July 1983, when he was terminated at the direction of Mr. Krusos because Visual, which had been in liquidation since the summer of 1983, no longer needed him and there was no position for him at CopyTele.

At the hearing, Mr. Krusos testified that he personally offered Mr. Hammer a job at CopyTele in November 1982 and that Mr. Hammer performed this job for CopyTele from November 1982 to the Spring of 1983 and that he never terminated Mr. Hammer but merely told him to go back and do his job.

In his affidavit in opposition to plaintiffs' motion, however, Mr. Krusos swore that Mr. Hammer never joined CopyTele as an employee, but in the Spring of 1983 he was still employed by Visual, and that he left in "a mutual parting of the ways between himself and Visual."

Plaintiff Catherines testified that he had been employed by Panafax Corporation ("Panafax"), a corporation of which Mr. Krusos was President, from October 1977 until April 1982, as Vice President of Advertising and Communications. Panafax was sold in the Spring of 1982 to a Japanese company and Mr. Catherines was terminated and thereafter was offered a temporary position as a consultant with Visual at $2,500 a month.

Mr. Krusos, according to Mr. Catherines, promised him a job in the Fall with his new company (CopyTele) and an opportunity to buy shares in this new company in return for the inadequate compensation which he had received from Panafax.

Mr. Catherines testified that in the Fall Mr. Krusos told him there was no place in the new company for him but that Mr. Krusos was still going to sell him the shares.

Mr. Krusos testified that in the Fall he offered, and Mr. Catherines accepted, a job with CopyTele similar to that which he had had with Panafax and that Mr. Catherines performed work for and was paid by Copy-Tele and that he left, "to be on his own."

Again, however, in his affidavit Mr. Krusos swore that Mr. Catherines had never joined CopyTele as an employee.

Senator Brantley testified that he too had been a Vice President at Panafax from 1977 to 1982 when he also was terminated. Concededly thereafter he was not offered a position by, and held none with, CopyTele or any other companies with which Mr. Krusos was associated.

Ten cents a share stock was also offered to and accepted by alleged financial consultants Hershel Smith and Jeff Lebowitz, and business consultant George Georges. Alvin Lebowitz, another financial consultant, was also offered stock on the same terms; the stock was purchased by his wife, Nettie Lebowitz.[3]

On January 20, 1983, Mr. Catherines and Mr. Krusos parted company and on February 1, 1983, Mr. Krusos wrote to him enclosing a check for one thousand dollars and advising him that he was removing his name as a shareholder of CopyTele.

On February 13, 1983, Mr. Catherines returned the check protesting the action taken.

On March 23, 1983, Mr. Krusos for the first time wrote advising Mr. Catherines that his purchase of shares had been "in consideration of your continued association with the new company, CopyTele" and as

---

**3.** Nettie Lebowitz, in her affidavit, asserts that when she purchased the shares in November of 1982, her husband had agreed to provide financial consulting services to CopyTele. At the time of the purchase, she asserts that she orally agreed at the advice of her husband that she would not sell these shares until CopyTele developed a marketable product.

part of an agreement to get "CopyTele off the ground and on its way to success."

On May 10, 1983, CopyTele's attorneys wrote a letter to Mr. Catherines' attorneys confirming Mr. Krusos' position.

Concededly, no demand was made by CopyTele on Mr. Hammer for the return of his shares when he left Visual in July of 1983 and no such demand was made or notice as to any agreement or condition was given to Mr. Hammer until after he attempted to sell his shares in October of 1984.

On November 29, 1984, Mr. Krusos wrote Mr. Hammer such a demand letter advising him that the consideration for his purchase of shares at ten cents per share was that he would have been employed by CopyTele and that he would have worked together as an employee of CopyTele "to build it into a successful and lucrative company."

At the same time, Mr. Catherines, in his attempt to sell his shares, received virtually an identical letter pointing out to him he was "never even employed by CopyTele in any capacity."

## DISCUSSION

To summarize at this point, defendants have presented this Court with essentially three arguments to substantiate their position that they may rightfully prevent plaintiffs from selling their stock. First, they argued that plaintiffs orally agreed to become CopyTele employees as a condition of their purchasing the stock. Second, they argued that plaintiffs orally agreed not to sell their CopyTele stock until the product had been developed and successfully maketed. The facts as presented thus far have fleshed out these arguments. But, a third argument which defendants presented at the eleventh hour, that is on the day the hearing was commenced on the merits of these "sale constructions," was that plaintiffs were privy to "inside information" and thus, *a fortiori* ineligible to sell their stock. Turning to address the validity of defendants' arguments, we will deal with this latter argument first as the first two are

somewhat related and require more discussion.

## 1. *Knowledge of Inside Information*

■ Accepting as a very real possibility defendants' contention that inside information might be revealed, this Court duly closed the courtroom and sealed the record whenever requested throughout the hearing. Having heard the evidence, this Court can now freely say that there is no basis for this claim.

Defendants attempted to argue that although plaintiffs had no official employment relationship with CopyTele during its first two years, they were in frequent contact with present employees of CopyTele on an informal basis and thus, had access to non-public information. This allegation was not borne out. For example, Mr. Michael Abatemarco ("Abatemarco"), who was then and is now a CopyTele employee, denied revealing any such information to Mr. Catherines in his telephone conversations with him. (We might add here that Mr. Abatemarco also denied having any knowledge of any agreement or condition attached to his ten-cent employee shares.)

To discredit defendants' argument concerning knowledge of inside information, plaintiffs showed that the product and "raison d'etre" for CopyTele was in fact no big secret at all, having already been the subject of several articles in commonly circulated publications such as Fortune magazine. Petre, "The Mystifying Business Behind a Magical Stock," *Fortune*, June 11, 1984, at 55 (Exhibit 18); *see also* Kindel, *et al.*, "Flat-Panel Display Remembers Images When It's Turned Off," *Popular Science*, August 1984, at 58; Andrew, "Heard on the Street: CopyTele's Stock Performs Like a Champion, Considering Firm Hasn't Closed a Single Sale," *Wall St. J.*, November 1, 1984, at 63.

Defendants themselves were also busy publicizing their product by hunting for companies which might be interested in marketing and manufacturing their product when the prototype was ready; in do-

ing so, defendants had made product presentations to such companies as Xerox Corp. Finally, if CopyTele was written about in such common publications and publicized by defendants themselves, this Court also has no doubt that CopyTele's progress in developing its product was probably discussed within more technologically specialized publications and within various privately circulated trade publications that are available for "sophisticated investors."

In sum, there is no credible evidence in the record to date showing that any non-public, material information has been transmitted to these plaintiffs, and hence we find that this is not a valid basis for CopyTele's refusal to permit plaintiffs from selling their stock.

2. *Conditions Relating to Future Employment and Successful Product Development*

■ As indicated, defendants claim that plaintiffs should not be permitted to sell their stock because (a) they (at least in the case of Messrs. Hammer and Catherines) breached their employment agreements with CopyTele and hence were not entitled to the same, and (b) they took possession of the same subject to an agreement not to sell until they received permission to do so from Mr. Krusos or Mr. DiSanto or until CopyTele's product was successfully developed and marketed.

Mr. Krusos may well believe at this point in time that he had in mind in November 1982 (and indeed may even have told some of the ten-cent purchasers), that he was dispensing such shares in order to attempt to hold the loyalty of as many of the purchasers as possible to him in one capacity or another in the financing, development and eventual marketing of his new product, but there is nothing apart from his belated claim to substantiate the existence of an agreement between all of the purchasers or between any of the plaintiffs and him or their acceptance of his claimed conditions. Indeed, all of the documentary evidence is to the contrary. The prospectus and Copy-

Tele's letter to Bradford dated June 23, 1983 negate his claim. Mr. Krusos' own letters evince a developing—not a fixed—claim from the inception of the alleged agreement or condition.

The restrictive agreement or condition begins as one that will last until the ten-cent shareholders "get CopyTele off the ground and on its way to success" (Exhibit 14). It progresses from there to a point where CopyTele has been built "into a successful and lucrative company" (Exhibit 17), from there until "its product was successfully developed and marketed," or until "granted permission by Mr. DiSanto or myself" (Krusos' affidavit), and from there to such time as CopyTele had received a binding order at an acceptable price for five thousand units from Xerox (Krusos' testimony at the hearing). Apart from the portion of each such condition that pertained to "permission" to sell, the first three versions of the conditions were and are unenforceable and void by reason of being too vague and indefinite. Only the last of such versions, first advanced at the hearing, might survive such a challenge.

Moreover, Mr. Krusos' versions of the conditions for entitlement to purchase such shares, have been in a state of flux. Prior to the commencement of this lawsuit, in identical letters dated November 29, 1984, addressed to Messrs. Catherines and Hammer, Mr. Krusos took the position that he had given purchasing privileges to fifteen former employees of Visual and its affiliated companies on the condition that they work together as employees of CopyTele and that in his view, neither of them "were [n]ever even employed by CopyTele in any capacity and that there has been a total failure to consideration on [their] part with respect to the bases upon which [they] were granted the rights to purchase these shares." Mr. Krusos' respective letters to each of them further demanded that they return their shares of CopyTele in exchange for a check from CopyTele for the amount of their original purchase price.

In Mr. Krusos' affidavit in support of defendants' memorandum in opposition to

plaintiffs' motion, dated December 17, 1984, he stated that he and Mr. DiSanto had decided in November of 1982 to offer shares of CopyTele to only twelve employees of Visual (at 7). Interestingly, although Messrs. Catherines and Hammer were listed among these persons, Senator Haskew Brantley was not. Subsequently, when Senator Brantley joined this action as a plaintiff, Mr. Krusos did not deny that Mr. Brantley had served as a consultant for his various affiliated companies. As for plaintiffs Catherines and Hammer, Mr. Krusos stated in his affidavit that "there is no dispute that neither Catherines nor Hammer joined CopyTele as employees" (at 13).

At the hearing before this Court, on the other hand, Mr. Krusos again shifted his position by attempting to claim that these two plaintiffs had been employees of Copy-Tele and had left of their own accord. Senator Brantley, of course, was never claimed to have been, or offered an opportunity to have become, an employee of CopyTele.

Sections 152 and 153 of the Delaware General Corporation Law apparently have been construed to mean that services to be performed in the future are not valid, legal consideration for the issuance of stock by the corporation. *In re Seminole Oil and Gas Corporation,* 150 A.2d 20 (Del.Ch. 1954); *Maclary v. Pleasant Hills, Inc.,* 109 A.2d 830 (Del.Ch.1954). CopyTele appears to be taking the position that the shares issued to Messrs. Krusos and DiSanto and their families and the ten-cent shareholders were validly issued even though a substantial part of the consideration therefor was for prospective future services.

Under Delaware law, this apparently may not be and, if the shares are to be deemed validly issued, they must be in return for "cash, services rendered, personal property, real property, leases of real property or a combination thereof," or otherwise as Section 152 requires.

### 3. Subject Matter Jurisdiction

■ Insofar as subject matter jurisdiction is concerned, there is no question but that this Court has jurisdiction over Senator Brantley's claim on the basis of diversity, if not otherwise. In the case of Messrs. Catherines and Hammer, the question is more complicated, particularly insofar as damages are concerned, but their claims for injunctive relief, and nominal damages in any event, would appear to lie under Rule 10(b)(5) by reason of the apparent conflict in the various representations which may have been made to the purchasers of the ten-cent shares as to (other than Rule 144) restrictions, conditions or lack thereof, on the sale of the stock.

In view of what we have said with respect to the vagueness and indefiniteness of some of the representations and the evidence pertaining to the lack of any such restrictions or conditions on the one hand and the defendants' claim as to the force and effect of the same on the other, there is no question as to materiality because the value of the stock as of November 30, 1984, would be substantially different if the additional restrictions were in force and effect from the value if the same were non-existent or unenforceable.

Accordingly, we think we have subject matter jurisdiction in this case.

### 4. Grounds for Injunctive Relief

■ To prevail, the plaintiffs must show possible irreparable injury and either (i) probable success on the merits or (ii) sufficiently serious questions going to the merits to make them a firm ground for litigation and a balance of hardships tipping decidedly towards the party requesting preliminary relief. *Sadowsky v. City of New York,* 732 F.2d 312, 316 (2d Cir.1984); *Mattel, Inc. v. Azrak-Hamway International, Inc.,* 724 F.2d 357, 359 (2d Cir.1983); *Sperry International Trade, Inc. v. Government of Israel,* 670 F.2d 8, 11 (2d Cir.1982); *Keeler v. Joy,* 489 F.Supp. 568, 574 (E.D.N.Y.1980) (Platt, J.).

As indicated above, plaintiffs have shown a likelihood of success on the merits. Apart from Mr. Krusos' changing claims, the Court is unable to find anything to

support any restrictive agreement or condition (other than Rule 144) imposed upon or accepted by the plaintiffs. Mr. Krusos is a lawyer admitted to practice in this State, and certainly must understand that regardless of what may have been said in oral discussions with employees of former companies about their continuing loyalty or his award of additional compensation to them in the form of opportunity to buy shares in his new company for the same, such statements did not constitute an agreement or condition not to sell their stock for indefinite periods of time—at least not in the face of the subsequent documentary evidence to the contrary. The fact of the matter is that there does not appear to have been anything more than informal discussions between some of the ten-cent purchasers and Mr. Krusos and there were no agreements or conditions binding upon the plaintiffs before or at the time of their purchases.

As to the possibility of irreparable injury, subsequent to November 30, 1984, the first day of plaintiffs' eligibility to sell their shares under Rule 144, CopyTele's stock on the NASDAQ market has dropped from 32.625 dollars per share to 19 dollars on January 4, 1985, i.e., by almost 40 percent.

In February the available supply of CopyTele shares on the market will be increased from 600,000 shares to 850,000 shares, i.e., an increase in excess of 40 percent. An additional 60,000 shares may become available through the exercise of warrants.

As Mr. Krusos himself admitted, these additional shares may affect the market in this stock.

CopyTele has yet to produce its product. It has had no sales and no income apart from interest on its capital. It had, as of July 31, 1984, an accumulated deficit in excess of 2 million dollars and net losses for the nine months period ended July 31, 1984 in excess of 1.1 million dollars. During the same period its selling and administrative expenses were almost 1.3 million dollars. With current annual expenses of almost 2 million dollars, CopyTele may run out of money within the next two years.

CopyTele has yet to announce the development of a prototype of its highly sophisticated electronics system which no one heretofore has ever been able to produce successfully.

Under the circumstances, this Court feels that the plaintiffs have shown possible irreparable injury and that they should be granted the preliminary injunction requested in paragraphs a and b of their order to show cause and the Court so orders such an injunction.

The plaintiffs should submit an appropriate order as promptly as possible.

SO ORDERED.