**Michael ABATEMARCO, Plaintiff,**

v.

**COPYTELE, INC., Bradford Trust Company, Denis Krusos and Frank DiSanto, Defendants.**

**No. 85 CV 1103.**

United States District Court, E.D. New York.

April 26, 1985.

Polstein, Ferrara & Campriello, New York City by Robert Polstein, Austin V. Campriello, New York City, for plaintiff.

Satterlee & Stephens, New York City by Henry J. Formon, James F. Rittinger, New York City, for defendants CopyTele, Krusos and DiSanto.

## MEMORANDUM AND ORDER

PLATT, District Judge.

By an order to show cause with an affidavit of the plaintiff and exhibits annexed, plaintiff moves pursuant to Rule 65 of the Federal Rules of Civil Procedure for an order (i) enjoining each of the defendants from taking any action which would in any way interfere with (a) plaintiff's selling the 14,000 shares of CopyTele, Inc. stock that he owns, and (b) the transfer of the registered ownership of any of the 14,000 shares of CopyTele, Inc. stock owned by plaintiff to a third party; or, alternatively, (ii) permitting plaintiff to sell his 14,000 shares of CopyTele, Inc. stock and to place the proceeds of such sale in an interest-bearing account subject to the further order of this Court.

After the parties appeared on April 1 and 2, 1985, to argue the merits of plaintiff's motion, an evidentiary hearing was held on April 12, 15, and 16, 1985. Plaintiff testified in his own behalf and was also called

as a witness. No other witnesses were called by the plaintiff or the defendants.

Plaintiff said that he was a "manufacturing engineer" without an engineering degree; that he had worked over the years for companies such as Burroughs, Sperry, Litton and Kollsman; and that he decided in 1979 that he wished to come back to Long Island and called the defendant Frank DiSanto with respect to the availability of a job; that as a result of such call in 1980 he went to work for Visual Sciences and that in August 1982 he started to work for the defendant CopyTele, Inc.; that in November 1982 he purchased 14,000 shares of CopyTele stock at 10 cents a share which was part of a sale of 390,000 shares of such stock to 17 individuals at such price; that the only restriction of which he was aware when he purchased the stock was that it was not "registered" under the Federal securities laws; that in October 1983 CopyTele had a public offering of its shares pursuant to a registration statement; that as a result of this public offering it became possible for him to utilize the provisions of Rule 144 promulgated under the Securities Act of 1933 to sell his Copy-Tele stock after he had held it for two years; that in December of 1984 three other individuals, G. Thomas Catherines, Allen J. Hammer and Georgia State Senator Haskew Brantley tried to sell their stock in CopyTele, and when the defendants refused to permit them to do so brought suit in this Court for an order permitting them so to do; and that in December 1984, pursuant to a subpoena, he testified at a hearing in connection with that suit that there was no agreement which prohibited the sale of the stock sold to the various individuals such as himself in the Fall of 1982 at 10 cents a share.

At the outset of the hearing in the case at bar, the attorneys for the defendants stipulated that they would not contest in this hearing the findings and conclusions in such prior hearing which are set forth in this Court's Memorandum and Order dated February 14, 1985, *Catherines, et al. v. CopyTele, Inc., et al.*, 602 F.Supp. 1019 (E.D.N.Y.1985), and that the only issue for

this Court's determination was whether the plaintiff at this juncture is an insider who was cognizant of facts "which are essentially extraordinary in nature and which are reasonably certain to have a substantial effect on the market price of the security if [the extraordinary facts are] disclosed." *Securities and Exchange Commission v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 848 (2d Cir.1968).

On his return to work at CopyTele after testifying in the *Catherines* case before this Court, the defendants reduced plaintiff's salary, deprived him of the use of a company car and moved his office from the engineering and work areas to the executive and administration area, apparently in order to be sure that he would not directly or indirectly have access to any such facts or information of a sensitive, proprietary and confidential nature intended to be available only to the corporation and not the public. In addition, plaintiff was deprived of a telephone and the locks and combinations permitting access to the engineering and work areas were changed so that he might not walk into the same without a proper escort.

On April 1, 1985, plaintiff resigned his position with CopyTele and is no longer an employee thereof.

Plaintiff has testified, and his testimony is uncontradicted, that he had no access to or knowledge of any information which is not already in the public domain.

CopyTele's product, still in the research and development stage, which allegedly contains material information which precludes its present and former employees, including plaintiff, from trading in its stock, is a flat-panel display which will "have a built-in memory in the sense that the images created by the display do not have to be refreshed as do images produced by cathode ray tubes ('CRTs') and other commonly used display devices." Plaintiff's Exhibit 11, CopyTele's Form 10K for Fiscal Year ended 10/31/84 dated January 28, 1985. It was stipulated in the course of the hearing that no prototype of this sys-

tem (called the CT–100 system) has yet been produced. The fact that no prototype has been produced has been noted in several recent publications which plaintiff introduced as exhibits, not for the truth asserted in them, but to confirm information asserted to be in the public domain. Kindel, *et al.*, "Flat-Panel Display Remembers Images When It's Turned Off," *Popular Science*, August 1984 at 58 (Ex. 1) (a copy is annexed to this Memorandum and Order); Petre, "The Mystifying Business Behind a Magical Stock," *Fortune*, June 11, 1984 at 55 (Ex. 2); Andrew, "Heard on the Street: CopyTele's Stock Performs Like a Champion, Considering Firm Hasn't Closed a Single Sale," *Wall St. J.*, Nov. 1, 1984 at 63 (Ex. 3); Dorfman, "SEC is Probing Copy-Tele," *N.Y. Daily News*, Nov. 7, 1984 (Ex. 4); Marcial, "The Year's Most Overpriced Stock?," *Business Week*, April 15, 1985 at 144 (Ex. 12); and Benway, "Magnificent Obsession? Don McShane Has a Thing for CopyTele," *Barron's*, April 15, 1985 at 13 (Ex. 13).

In defendants' aforesaid Form 10K it is stated that:

"The company has been developing a suspension consisting of submicron particles of suitable color pigments suspended in solvents. Each of these particles is surrounded by a charge control and a wetting agent which essentially coat the particle and enable it to retain an electrical charge and remain in suspension. The company has been mainly using a yellow pigment which is suspended in a dark dye solution. The company has used various fluids in its test panels and is continuing its efforts to improve the characteristics of the fluid, including other color combinations.

"Additional development of the structure, chip carrier drive system and fluid is required in connection with the completion of the flat-panel display. Upon completion of these efforts, if successful, the flat-panel display must be tested and modified as required prior to manufacturing."

The key men in the company and the co-inventors of the system are the defendants Krusos and DiSanto, the latter of whom was interviewed by Popular Science magazine writers in preparation for an article on the system which appeared in the August 1984 edition. Pl.Ex. 1. Mr. DiSanto is quoted in that article as saying, among other things, about perfecting electrophoretic technology within the panel:

"It's sort of an art ... You need exactly the right balance in the specific gravity of the particles and the specific gravity of the fluid ...

"It's a true suspension ... You can leave those pigment particles in that solvent indefinitely, and the particles will never sink.

"The major problem is a tendency of the particles to attach to each other and form globs."

In the article, a "diagram" of the system is exhibited with a caveat at the foot thereof which states that "CopyTele has made some technical changes in this design." Plaintiff testified at the hearing that at the time of this interview the defendant had an early working model of the display but that the photo area of such model was only 2″ × 2″ and that the scaling up of this photo area presented substantial problems which to his knowledge have not yet been overcome.

There are other aspects of the system which CopyTele claims to be sensitive, confidential and proprietary but from all the evidence, including the uncontradicted testimony of the plaintiff on the subject, the stumbling block between success and failure in making electrophoresis (as the process is called) work is to prevent the particles from tending to glom together, which apparently ruins the display.

In a very recent article on the subject, dated April 15, 1985, Barron's (which but for the fact that it confirms the statements attributed to Mr. DiSanto above, might not be admissible herein) reported that:

"Several companies, Matsushita and Xerox among them, have tried to make electrophoresis work, only to give up on

it long ago. And Matsushita invented it. *The ink particles tend to glom together, ruining the display.* Millions and millions of dollars have been thrown at the effort. 'Every major lab in the U.S. and Japan has attempted it', says Dr. Christopher King, a scientist with Planar Systems, a Tektronix spinoff working on another approach: electroluminescent flat panels."

Ex. 13 at 19 (emphasis added).

There is no doubt but that the plaintiff knows that the stumbling block is in the development and improvement (i) of a solution or (ii) in the composition of the panel or (iii) in the chip carrier drive system or (iv) a combination of two or more of the same, so as to eliminate the tendency of the particles to glob or glom, but as indicated above, this is public knowledge.

While it is true that in June of 1983, as evidenced by defendant's Exhibit C, which he prepared at that time, plaintiff had some exposure or involvement in the composition of the panel, his uncontradicted testimony is that he had no knowledge, exposure to or involvement with the development or improvement of the solution: His uncontradicted testimony and other evidence also make it clear that subsequent to June of 1983, there were changes in the design and composition of the panel as to which he has no knowledge.

Plaintiff readily agreed that he was aware of and involved in the development and alleged improvement of the flat-panel chip carrier drive system from one which involved 32 drivers to one which involves 64 drivers but testified, again without contradiction, that a 64-drive carrier was a catalogue or shelf item and that any experienced engineer could make the conversion from a 32 to a 64-drive carrier without any difficulty.[1]

Defendant claims that because plaintiff designed and constructed the framework necessary for the mounting of the display panel and the creation of electrical contacts and designed and drew various other parts of the system (although concededly he never prepared designs or drawings for the proposed CT–100 panel), he necessarily falls within the "tainted" insider category.

The test, however, is not as defendant argues whether plaintiff designed, drew and had knowledge of all of the interfacing and interoperative parts with the panel, nor whether he was privy to the fact that the system had not yet been perfected in one or more significant aspects (as indicated above, the public is fully aware of this), but rather whether he is cognizant of facts "which are essentially extraordinary in nature and which are reasonably certain to have a substantial effect on the market price of the security if [the extraordinary facts are] disclosed." *Securities and Exchange Commission v. Texas Gulf Sulphur Co.*, 401 F.2d at 848.

There is no question at this point about the fact that the hoped for "technological breakthrough" has not yet been achieved and this fact is no secret. It is widely known. Moreover, it is not sufficient to argue that plaintiff, regardless of whether he has knowledge of the possible "breakthrough", must be prohibited from selling because one or more other owners of the stock might misconstrue his action as a former employee as evidence of lack of capacity of the defendant successfully to make its product. Any such *per se* rule would effectively prohibit all officers and employees of public companies from trading in their company's stock if any research

---

1. Mr. DiSanto made the decision to change from a 32 to a 64-driver carrier system and to place the order for the same with Texas Instruments. Moreover, in January of this year, Mr. Lewit took over the development of the 64-driver system and thereafter plaintiff did no further work on the same.

The plaintiff's uncontradicted testimony throughout the proceeding was that during the course of his employment with CopyTele, he prepared designs and drawings for all parts of the system except the panel assembly which, as indicated above, was the crucial or key part of the system and with which he repeatedly said he had no familiarity or knowledge. He identified the individuals who had such knowledge to be Messrs. Krusos, DiSanto, Lespina, Schnarde and Dykstra.

and development work was being done by the company. The law, to date, has not gone so far.

Given the evidence presented to us at the hearing, and post-trial memoranda submitted by both parties, it seems clear that the plaintiff is not in the possession of or aware of any such facts and hence may not be foreclosed from investing in or selling stock in his former company merely because he may be more familiar with the company's general operations than are outside investors. *Id.*

Accordingly, plaintiff's motion is granted to the extent that he is hereby permitted to sell his 14,000 shares of CopyTele stock and to place the proceeds of such sale in an interest-bearing escrow account pending the outcome of the trial on the merits of the other issues in this case and subject to the further order of this Court. Defendant is given two business days from the date of this Order to obtain a stay of this Order from the Court of Appeals.

SO ORDERED.

# Flat-panel display remembers images when it's turned off

A dye-based display panel less than ¼ inch thick seems ideal for the next generation of portable computers. Print-sharp images are frozen in place without the need for continuous battery-draining refreshment. Panels can also turn photocopiers into printers.

By STEPHEN KINDEL, TRICIA WELSH, and JOHN FREE

You've found a seat on the commuter train. Time to key a few memos into your new personal computer and rework that electronic spread sheet you're developing. Out comes the lap-sized computer from your attaché case. Up goes its fold-back flat-panel display screen.

Surprise. There on the screen, before you've touched a single switch, is the budget graph you ran two days ago. The screen, not the computer, has "remembered" the image.

A revolutionary flat-panel display with this memory capability is under development at a small firm in Huntington Station, N.Y. CopyTele, Inc., recently showed an early working model of a flat-panel display with remarkable image-retention, low-power, and high-resolution features.

CopyTele's ¼-inch-thick panel, a replacement for bulky, power-hungry cathode-ray tubes (CRTs), works by maneuvering tiny dye particles suspended in a solvent (see diagram). The dye technology provides a unique feature: Once an image is formed, shutting off power to a panel—even unplugging it—won't erase the display. That's because gravity can't make the particles settle. Images are erased, as they're written, with voltage pulses to a grid of wires.

This "memory" feature means that dye images don't have to be constantly refreshed—redrawn at split-second intervals—as with CRTs and other displays. As a result, power demand is minimal. CopyTele estimates that its full-size 8½-by-11-inch panel, not completed at this writing, will consume only one watt.

CATHODE PLATE — METAL GRID — ANODE PLATE

SURFACTANT — 50-MICRON SQUARE

DYE INPUT — ONE ETCHED CATHODE LINE — ONE ETCHED ANODE LINE

DYE PARTICLE (100 TIMES SMALLER THAN GRID OPENING)

High-resolution CopyTele panel attracts microscopic dye particles to the inside surface of an etched-glass panel (cathode) to form alphanumeric or graphic images. Both the transparent front cathode and the glass back panel (anode) are treated to create a detailed pattern of electrodes. A metal lattice grid separates the glass panels in this design. The dye particles (exaggerated in size here) are suspended in a viscous solution sandwiched between the panels. A complete 8½-by-11-inch panel would have 2,200 horizontal rows and 1,700 vertical columns. To attract particles to the cathode, signals are applied to the appropriate vertical columns, then one horizontal row is excited with a voltage. CopyTele has made some technical changes in this design.

The panel will also produce highly detailed images. Claimed resolution will be so good—40,000 dots per square inch—that alphanumerics and graphics will appear to be printed on its surface. To exploit this superior resolution, one dye-panel system under development will turn ordinary photocopiers into high-quality printers.

Also, one CopyTele official has speculated about panel enhancements that would make the display suitable for color television.

## Better mousetrap?

Different types of flat panels, of course, are already in service:

● Liquid-crystal displays are prominent in portable computers.

● Plasma displays, with gaseous elements that glow like tiny neon lights, appear in some desk-top terminals.

● Solid-state electroluminescent technology is used for at least one take-along computer display.

But CopyTele wanted to avoid some limitations these panels have: only moderate resolution, a need for constant image refreshment, and high voltage and current requirements. So early last year the firm began electrophoresis experiments—controlling suspended particles with electric fields. Several other firms, including Xerox, are also perfecting electrophoretic technology.

"It's sort of an art," said Frank DiSanto, CopyTele president, describing a test-tube stage and other steps needed to develop a working particle suspension. "You need exactly the right balance in the specific gravity of the particles and the specific gravity of the fluid," he added. Researchers in CopyTele's second-floor lab scrutinized rows of test tubes with a "tremendous number" of particle-solvent combinations, DiSanto said. Particles sinking or floating to the surface spelled failure.

Finally, an extraordinarily small dye particle less than one micron (0.00004 inch) in diameter was selected, along with a complex chemical solvent. "It's a true suspension," DiSanto explained. "You can leave those pigment particles in that solvent indefinitely, and the particles will never sink."

But a common technical problem with electrophoretic suspensions lay ahead. "The major problem is a tendency of the particles to attach to each other and form globs," said DiSanto, who co-invented the panel with Copy-Tele chairman Denis Krusos. Particle globs, besides ruining the uniformity of screen patterns, can't pass through a fine-metal grid separating the front and back of the panel.

Two-by-two-inch flat-panel test cell built by CopyTele has 200-line-per-inch horizontal and vertical resolution, but is wired in a 12-by-12 matrix to spell out "CT 100." Larger panels will be used in CT-100 with electronic phone.

The solution: Develop an ultra-thin coating (surfactant) for the particles that keeps them separated. To test different surfactants, researchers used a two-by-two-inch panel. When all of the panel's picture elements are switched on at once, clumping or other problems become obvious: If the panel surface isn't entirely yellow (one dye color used), some of the picture elements are defective because of particle globs or other problems. Also, something is wrong if the screen isn't totally black after it's erased. CopyTele tested and adjusted its proprietary solvent until it worked properly.

To develop the panel hardware and associated electronics, CopyTele enlisted the help of major hardware firms such as Texas Instruments, Rockwell International, Mitsubishi, and others. The metal-coated, etched-glass panels and the metal grid separating them (see diagram) are formed with standard photoetching techniques used to create still-narrower patterns for integrated circuits. "We etch at about 50 microns [0.002 inch], an available technology in the electronics industry," said Krusos. That dimension allows 3.7 million picture elements on a full-size panel, enough for print-quality reproduction.

## Copier-printers

One of CopyTele's initial plans for the panel is an electronic system that can transmit documents or data over telephone lines between modified photocopy machines. "We wanted to build a system that would allow a copier to also function as a high-resolution printer," said DiSanto.

CopyTele's idea is to substitute its panel for the lid on ordinary copying machines. Instead of scanning a piece of paper, the copier would reproduce the high-resolution display.

This marriage of copier and display technologies would enable you, for example, to send detailed graphics and text information from one office to many branch offices, using one low-cost printer-copier machine at each site. CopyTele's system, dubbed the CT-100, could accept signals from ordinary keyboard terminals, word processors, personal computers, or communicating typewriters, displaying super-sharp characters for rapid duplication by a copier.

Major firms that contributed millions of dollars in development funds received only the right to manufacture panel components if the display is commercially successful. Xerox has signed a letter of intent to buy 5,000 CT-100 systems if they meet specified criteria. DiSanto expects CopyTele's high-quality printing system to add several thousand dollars to the price of a copier. But the cost of a panel alone, as a CRT replacement, could drop rapidly as the technology for making the associated microcircuits improves, he believes.

And how about using CopyTele's flat-panel technology for a TV receiver? DiSanto smiled. "You know," he said, "we're providing much greater resolution than television needs right now. If we could use alternating bands of dye in different colors needed for television, we could have something very quickly—probably sooner than anyone would think possible."